## ANNELY v. DeSAUSSURE.

1. Where land that is incapable of actual division or separate occupancy, *e. g.*, a wharf, is wholly taken possession of by a tenant in common, he necessarily excludes his co-tenant; and after such ouster, the ten-ant in possession is liable to the co-tenant for rents and profits.
2. Where an improving tenant receives no compensation for his improve-ments to the common property, he is not chargeable with the rents due to his improvements; but where he is compensated to the extent of the increased value imparted to the premises by these improvements, he should be charged with so much of the rents as is due to the pro-perty in its unimproved condition.
3. Where a tenant by his improvements, made under a belief of exclusive ownership, utilizes a valuable wharf property, the rents received there-from are due in part to his improvements (for which he is not account-able) and in part to the land upon which they were placed (for which he is accountable).
4. The tenant in possession insured one of the buildings on this wharf, after action instituted, and it was burned, and the insurance money was used in restoring the burnt building. *Held,* that he was not lia-ble to his co-tenant for any part of this insurance money.

32

Before WALLACE, J., Charleston, April, 1885.

The opinion sufficiently states the case. For a full history see the former appeals. 12 *S. C.*, 500; 17 *Id.*, 395.

*Messrs. B. J. Whaley* and *Samuel Lord*, for appellants.

*Mr. Theo. G. Barker*, contra.

April 20, 1887. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. This case has been twice before in this court, and in order to make the precise points in issue as clear as possible, we will make a very brief reference to its history. It seems that one John W. Lewis, sr., and others, as tenants in common, owned the property in the city of Charleston, known as the "Commercial Wharves," and being largely indebted to Amelia and Anna Maria Annely, on January 5, 1859, executed to them a mortgage of "all the undivided one fourth part of all the pieces and parcels of ground and land covered by water, called Commercial Wharves, situate, lying, and being in the city of Charleston, &c., together with all the houses, buildings, erections, and embankments and piers," &c.; that in 1871, the said Lewis, the mortgagor, died, leaving a will, of which the late Wilmot G. DeSaussure, Esq., was the sole qualified executor; that the said executor, in concert with the other tenants in common, effected a sale of the property for $35,000 to the "Commercial Wharf and Cotton Press Company," who were let into the possession and immediately commenced valuable and costly improvements thereon. It appears, however, that the mortgagees of Lewis, being "disappointed in the sale," repudiated it, and instituted these proceedings to foreclose their mortgage against Wilmot G. DeSaussure, as executor, and the purchasers, the defendant corporation. The principal question then made was, whether the sale bound the mortgagees, or were they entitled to foreclose on the property. It was decided by this court that they were entitled to foreclose, and the cause was remanded for further proceedings. See 12 *S. C.*, 500.

Accordingly the case went back, and in January, 1880, it was

referred to master W. D. Porter, to inquire and report whether there were parties other than those before the court entitled to participate in the assets of the estate of Anna M. Annely, and also "whether the improvements are of a nature and the property so circumstanced as to call for the recognition of equitable severalty in them as regards the undivided interests derived under different titles," &c. The master ruled that his inquiry was limited to the points indicated, and refused to go into all the questions *de novo*. The case again came up on exceptions, and the Circuit Judge, Mackey, confirmed the report and ordered the one undivided fourth (sixth) part of the property sold, and the proceeds applied towards payment of the mortgage debt, directing also the master "to inquire and ascertain the rental value of the premises so directed to be sold while in possession of defendant corporation, and to that end he be authorized to require the production of the books of the company."

Upon exceptions to this decree the case came again to this court, and a second judgment was pronounced, November term, 1881, which, among other things, declared as follows: "There cannot be a doubt that when the Commercial Wharf and Cotton Press Company took possession of the property in question and contracted for the improvements, they were acting under the honest conviction, based upon the advice of eminent counsel, that they had acquired the legal ownership of the property, free from the lien of the mortgage, and hence, under the principle above announced (*Scaife* v. *Thomson*, 15 *S. C.*, 337), the company is entitled to an allowance for the improvements. And as it has been ascertained that actual partition is not practicable, but that a sale of the undivided sixth part of the property will be necessary, the company must be held entitled to receive out of the proceeds of sale, not the proportionate part of the cost of the improvements put upon the common property, but the amount which such improvements shall upon inquiry be ascertained to have enhanced the value of such one undivided sixth part, and that the balance of the proceeds of sale be applied to the mortgage debt. * * * The next inquiry is as to the rents and profits. This, too, as it seems to us, is settled by the principles announced in *Scaife* v. *Thomson*, *supra*, and in taking the account of the rents and pro-

fits, the Commercial Wharf and Cotton Press Company should not be held liable for such rents and profits as may be due to the improvements put upon the property by said company." See 17 S. C., 395.

When the case went back the second time, it was referred, under the above judgment, to master Sass to inquire into and report upon the matters directed therein. He took, as he says, a great deal of testimony and reported, among other things, the following:

"First. I find that the value of the property known as Commercial Wharves on January 4, 1875, as fixed by the sale made on that day was $35,000, one-sixth of which amount is $5,833.33. Under the orders in the case, I sold on March 15, 1883, one undivided sixth part of said property for the sum of $8,000 cash, being at the rate of $48,000 for the whole property, the Commercial Wharf and Cotton Press Company being the purchaser. The value of the property, therefore, had become enhanced between the period of the sale in 1875 and that of the sale in 1883, to the amount of $13,000, and that of the undivided sixth part to the amount of $2,166.67. I find from the testimony that this enhanced value was *due* wholly to the improvements placed upon the property by the company.

"Second. I find from all the testimony that the rents and profits of the property since it has been in the possession of the company has been entirely *due* to, and depended altogether upon, and proceeded wholly from the improvements made by the company; that without such improvements it would have produced no income at all, but would have deteriorated more and more every day, and would not have rented for the amount of taxes. This being the case, I do not consider that a detailed statement of the company's books of the rents actually received is necessary, and I have not required the production of the books.

"A claim was made before me during the progress of the cause for a share of the insurance money received by the company after the fire in 1880, by which the property was destroyed. Upon this point I find, as matter of fact, that the company insured the entire property in their own name and upon their own account; that notice was given to the insurance companies, after the fire,

by the plaintiffs' attorneys, not to pay over the insurance money to the company, but that, notwithstanding, it was paid to the company, and was by them expended in repairing, restoring, and renewing the buildings, *et al.*, destroyed ; that these repairs were made by the company for their own interest, the brick warehouses being replaced by sheds for the better storing of cotton," &c.

The Circuit Judge confirmed this report, and the appeal comes to this court for the third time upon the exceptions :

"1. Because the Circuit Judge erred in holding that all the rents and profits or rental value of the property held in common were attributable to the improvements, and that no part thereof was attributable to the plaintiffs' property, which formed a part of the basis of the company's operations, and without which no rents or rental value could accrue from or attach to the improvements put thereon by the company.

"2. Because the evidence shows that of the improved or enhanced value of the property, the unimproved part constitutes near three-fourths parts, and the judge erred in crediting the entire rent to the smallest part of the property, allowing nothing for the use and occupation of plaintiffs' land, when they were excluded from the possession.

"3. Because the judge erred in sustaining the master's refusal to require the production of defendant company's books to show whether any, and if any what, rents and profits were or might have been received by them.

"4. Because the judge erred in holding that the defendant company could insure the whole interest in their own name for their sole benefit, to the exclusion of the tenant in common, from whom possession was withheld, and whose rights were denied during an ouster of ten years.

"5. Because the judge erred in holding that the defendant company were not estopped from contending that no part of the insurance money was for the benefit of the plaintiffs, or of those from whom they claimed.

"6. Because the judge erred in not holding that the defendant company were bound to insure by the contract under which they entered into possession.

"7. Because the judge should have held that under the circum-

stances of this case, independently of all contract, the company were bound to take the same care of plaintiffs' property as they did of their own, and to indemnify them against loss.

"8. Because the company exposed plaintiffs' property to extraordinary risk in storing thereon an inflammable article like cotton, and should have insured the same *pendente lite*.

"9. Because the evidence showed that nearly all of the buildings for which the insurance money was received were original structures upon the property when the company purchased, and that the judge erred in not sustaining plaintiffs' exception to the master's report, in that he did not report this fact," &c.

Exceptions 1, 2, and 3 relate to the subject of rents and profits. It has been decided that the mortgagees have substantially the same rights as their mortgagor, Lewis, had, and the case may be considered as substantially one for partition in equity between tenants in common. In such case, if one of the owners in common has received more than his share of the rents and profits, the court will direct an account for the purpose of decreeing reimbursement. When, in 1875, the wharf company purchased the premises in question, they did not acquire Lewis's interest of one-fourth, but became, by operation of law, tenants in common with those entitled to that interest, and remained so without partition down to the sale by the master in 1883. Each tenant in common has the right to occupy according to his interest. Ordinarily, as to agricultural lands, the tenants may actually occupy their respective shares; but one of the peculiarities of this case arises from the nature of the property, which, being a wharf, is suited only for one purpose, and is essentially a unity and incapable of actual division or separate occupancy. The possession of the whole property by the company under their purchase, necessarily excluded those holding the Lewis interest, and must be considered as an ouster of that interest. When one tenant in common ousts another, he is certainly, as a rule, liable to the ousted tenant to the extent of his share for rents and profits. *Lyles* v. *Lyles*, 1 *Hill Ch.*, 76; *Jones* v. *Massey*, 14 *S. C.*, 292.

But it seems that in this State an exception has been established, which Chancellor Johnston, in *Hancock* v. *Day*, McMull.

*Eq.*, 73, stated as follows : "The general rule established by them [former cases of *Thompson* v. *Bostick* and *Holt* v. *Robertson*] is, that as between co-tenants, the occupying tenant is liable for the rent of so much of the premises as was capable of producing rent at the time he took possession, but not liable for what was rendered capable by his labor. If he makes improvements, he is not entitled to raise a charge for them." This is very plain, but it will be observed that this rule was established in cases where the improving tenant was not entitled to compensation individually for his improvements. As he could not make a charge for improvements, it was manifestly equitable that he should not be charged rent for those improvements. As Chancellor Harper stated it, in the case of *Thompson* v. *Bostick, supra*, "If the tenant in possession should build a mansion on the land or a mill or manufactory, it would be enough that the co-tenant should take his share of the land, increased in value by the improvements, without charging the tenant, at·whose expense they were constructed, with rent for the time they were used by him," &c.

But now a new case has arisen, in which that very "increased value" is taken from the tenant out of possession, and paid to the improving tenants for their improvements ; and it is urged that, having been paid out of the common property, they should account to the common property for the whole rents arising from the improvements, precisely as if all the tenants had contributed to make the improvements. This view would certainly be very strong, if the improving tenants were reimbursed to the whole extent of the costs of the improvements. They are, however, limited to the increased value which their improvements have imparted to the property ; and it might not, probably would not, on that account be equitable to make them account for all the rents of the improved property, including one tenant who had stood aloof and contributed nothing. But as the tenant out of possession in this case has been deprived of all interest in the increased value imparted by the improvements, it seems to us equity requires that he should have an account against the tenants in possession, at least for so much of the rents as his ownership of an undivided fourth of the property may be found, upon a fair accounting, to have contributed (along with the improvements)

to the production of the rents—leaving the rents "due to the improvements" to those who made them.

We think this is the proper construction of the former judgment of this court. The words are, "In taking the account of the rents and profits the company shall not be held liable for such rents and profits as may be due to the improvements put upon the property by the said company." The words, "such rents and profits," indicate that it was not in contemplation that all the rents were "due" exclusively to the improvements. It must have been considered that something was "due" to the land on which the improvements were erected, to say nothing of the houses found there when the company took possession. Assuming, as stated by the master, that "without the improvements the property would have produced no income at all, and could not have rented for the amount of the taxes," yet it strikes us that something was necessarily "due" to the ownership of one-fourth of the land on which the improvements were placed. The improvements may have been the final act in utilizing the wharves, but those improvements were only possible with the ground upon which to place them. If the land and original houses would have produced no income without the improvements, so the improvements could not have been made at all without the land as the basis of the operation. Suppose a mill site, producing nothing in the shape of rents, but having undeveloped capabilities, is utilized and a mill erected upon it, could it be said that no part of the fruits of the enterprise would be "due" to the owner of the site in whole or in part?

Both the land and the improvements were elements in producing the joint result, and, as it seems to us, something of that result must in fairness be "due" to each. It may be difficult to ascertain precisely to what extent the ownership of a fourth interest in the property and the brick buildings originally there, contributed to the rents of the whole; but we cannot doubt that something was "due" to them, and that the very object of the reference in the former judgment was, if possible, to ascertain what it was. The inconvenience or difficulty attending partition furnish no ground for refusing the relief the parties are entitled to. 3 *Pom. Eq. Jur.*, § 1389. It is the principle of equity to

do exact justice to all ; and while, under certain circumstances, it is considered just to give to the improving tenant the enhanced value his improvements have imparted to the common property, yet that will be done only "as far as is consistent with the equity of his co-tenant." See *Johnson* v. *Harrellson*, 18 *S. C.*, 604 ; *Buck* v. *Martin*, 21 *Id.*, 593 ; 1 *Story Eq.*, § 655.

The other exceptions make the point that the judge erred in refusing to allow the mortgagees a part of the insurance money received by the company after the fire in 1880, which destroyed the buildings, sheds, &c. Upon that subject the master reports in substance that, as matter of fact, the company insured the entire property in their own name, upon their own account, and when the money was received it was "expended entirely in repairing, restoring, and renewing the buildings destroyed," &c. Insurance is not an incident to the thing insured, but indemnity or compensation to the person insuring for the loss which he sustained. *Wilson* v. *Hill*, 3 *Metc.*, 66 ; *Carpenter* v. *Insurance Company*, 16 *Peters*, 496. Under the case last cited, the question is fully discussed in notes to 2 *American Leading Cases*, page 247, where the conclusion is stated, as follows : "At the present day a policy of insurance is invariably treated as a contract to indemnify the party insured, and not as a mere undertaking to be answerable to the extent of whatever injury may be sustained by the subject matter insured. This construction has always been put on policies against fire. *The Saddlers' Insurance Company* v. *Badcock*, 2 *Atk.*, 554."

The company supposed they had purchased the whole property, and therefore naturally included the whole in the insurance on their own account. But, as it turned out, there was a flaw in their title to the extent of one-fourth which belonged to others, with whom they became tenants in common. Such a tenant can insure his own interest as a distinct thing, and is not accountable to his co-tenant therefor ; and, as we understand it, he has not an insurable interest in the share of his co-tenant. The policy must therefore be considered as that of the company who made the contract, and who alone could have enforced it. See *Harvey* v. *Cherry*, 76 *N. Y.*, 442. Besides, the company took out the policy in order to cover property which consisted principally of

structures erected by them; and when the insurance money was used in restoring those structures consumed by fire, it became simply an additional advance for the improvements, which, as touching the rights of the plaintiffs, we have already considered. We agree with the Circuit Judge that the company should not be held responsible for any part of the money received for insurance.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the cause be remanded to the Circuit for an inquiry and accounting between the parties, according to the conclusions herein announced.